**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 10, 2019

**BY ECF**

The Honorable George B. Daniels
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *United States* v. *Matiss Puke*, 18 Cr. 509 (GBD)

Dear Judge Daniels:

      The defendant in this case, Matiss Puke ("Puke" or "the defendant"), is scheduled to be sentenced on April 16, 2019, having pled guilty to conspiracy to commit wire fraud. The Government respectfully submits this letter in advance of the sentencing. In a plea agreement between the parties, the Government and the defendant stipulated to a United States Sentencing Guidelines range of 21 to 27 months' imprisonment (the "Guidelines Range"). For the reasons set forth below, the Government submits that a sentence within the Guidelines Range would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

    **A. Offense Conduct**

      *1. The Fraud Scheme*

      This case involves a wire fraud and money laundering conspiracy by a network of individuals located in the United States and overseas. The conspiracy has targeted victims principally through variations on an internet fraud: a member of the conspiracy posts an advertisement for a car, boat, tractor, kitchen appliance, or other singular, big-ticket items for sale on the internet. (United States Probation Presentence Investigation Report ("PSR") ¶¶ 11, 12.) These advertisements are typically posted on well-known websites involving either auctions or direct sales, such as eBay or Craigslist. (*Id.*) Though posted on sites where unaffiliated sellers can attempt transactions, the conspiracy often fraudulently utilizes the names, logos, and business pedigree of legitimate businesses to give the veneer of credibility to the advertisements, and take advantage of positive reviews attributed to the true businesses. (*Id.*)

      After a prospective victim makes an inquiry in response to an advertisement, the members of the conspiracy controlling the fake advertisements negotiate with the buyers, typically via email. (*Id.* ¶ 13.) The conspirators and victims come to an agreement, at which point the conspirators provide wiring instructions to the victims. (*Id.*) Maintaining the illusion of legitimacy,

conspirators suggest an arms-length transaction by directing victims to third-party bank accounts, which are either corporate or business accounts. (*Id.*) Those accounts are opened at the banks in the names of shell corporations established for the purpose of furthering the fraud. (*Id.* ¶ 15.) Once recruited by the conspiracy, members responsible for the bank accounts are named as the principals of the shell corporations, and in turn open accounts at multiple banks to await transfer of victim funds as directed by the co-conspirators controlling the online advertisements. (*Id.*)

Victims then wire funds into the shell corporation bank accounts, believing they are transmitting funds in order to, for example, purchase a classic automobile and pay for its transportation. (*Id.* ¶¶ 12-13.) Next, conspirators who have established the bank accounts are alerted to the money transfers by other members of the scheme. On the same day of the transfer or the following day, members of the scheme controlling bank accounts head to the banks and begin withdrawing funds. (*Id.* ¶ 17.) The withdrawals are made in cash, from both ATMs and the tellers at bank counters. (*Id.*) Participants in the scheme would be informed of the amount of the victim transfer, name of the victim, and the item these victims believed they would be purchasing. Such information would be needed in case bank employees inquired into the legitimacy of the transfer.

During this short period, victims are unaware that their funds are being drained, and the overriding goal of the conspirators is to take all the money before the funds can be frozen and otherwise stopped. To accomplish this, conspirators will withdraw funds from numerous bank branches in rapid succession, frequently on the same day. After funds are withdrawn, money is then distributed among the conspiracy in various ways, including via wiring, transfer to cryptocurrency, or physical transportation, principally from within the United States back to Europe. (*Id.*) Victims do not ever receive the items they believed they were purchasing, and are generally unable to recoup their funds once the money has been withdrawn from the accounts. (*Id.* ¶ 16.)

   2. The Defendant's Conduct

Puke was a member of the conspiracy who opened bank accounts in the name of a shell corporation and withdrew victim funds. (*Id.* ¶ 21.) Puke is a native of Latvia and arrived in the United States on February 21, 2018. (*Id.*) Shortly after his arrival in the United States, a shell corporation named Pukerton Corp. was opened in his name, on March 8, 2018. (*Id.*) Puke opened bank accounts in Pukerton Corp.'s name at Chase, Bank of America, TD Bank, and Wells Fargo. (*Id.*) Beginning within days of opening these accounts, the defendant received victim funds in each of the Pukerton Corp. accounts and began withdrawing them. (*Id.*)

In total, Puke received wire transfers from victims of the scheme totaling at least $144,300, and successfully withdrew at least $125,600 of those victim funds. (*Id.*) In one example, on April 6, 2018, Puke's Pukerton Corp. business banking account at Bank of America received a $40,000 transfer from a single victim. (*Id.* ¶ 22.) Starting on the same day and continuing on April 9, 2018, the defendant made three separate transactions to withdraw the entirety of those funds at three different bank branches. (*Id.*)

Puke lived in a house in Florida with other individuals involved in the same fraud scheme—Karliss Vitols, a co-defendant in the instant case, and Ivars Ozols and Madars Jankevics. Ozols and Jankevics were arrested on April 18, 2018 on charges stemming from the fraud scheme. Ozols and Jankevics have both pleaded guilty and been sentenced in the case *United States v. Mors et al.*, 16-CR-692 (S.D.N.Y.), currently pending before the Honorable Jesse M. Furman. Puke continued to engage in the fraud activity following Ozols's and Jankevics's arrest. His Pukerton Corp. account received a $30,000 transfer on April 23, 2018, and he withdrew $23,800 on April 24, 2018 at three different bank branches.

The individuals who had wired money into the Pukerton Corp. accounts became aware of the fraud only after it was too late. These victims believed they were purchasing real items, having communicated with ostensibly legitimate businesses and individuals. In reality, they were deceived and, as the copious victim statements make clear, the actions of the defendant and his co-conspirators caused real and traumatic harm to their victims.

### 3. The Status of Co-Defendants' Cases

Over two dozen co-conspirators have been charged in the case pending before this Court to date. Several of Puke's co-defendants have been convicted and are awaiting sentence by the Court, and three have been sentenced to date: (i) Aleksei Livadnyi to 27 months' imprisonment, (Dkt. 249); (ii) Durra Mehdiyeva to 18 months' imprisonment, (Dkt. 267); and (iii) Melvut Yazici to 22 months' imprisonment, (Dkt. 276). Co-defendants who have pleaded guilty and are awaiting sentence by the Court include Miraga Gulijev, Ielyzaveta Nazina, Ketevan Sepiashvili, Igor Kalinitchev, and Yelena Kudaibergenova.

Of the sentenced defendants, the amount the defendant withdrew from his bank accounts is most similar to the amount Mehdiyeva withdrew, but like Livadnyi, the defendant engaged in the fraud immediately upon arrival in the United States. Puke entered the United States in late February 2018, incorporated a shell corporation in early March 2018, and opened three bank accounts on March 22, 2018—only one month after arriving in the U.S. Puke's participation in the scheme also appears to have been cut short only by a number of external factors—closure of two of his bank accounts for fraud, the arrest of Ozols and Jankevics on similar federal charges, and his arrest on May 28, 2018 by Michigan authorities.

## B. The Plea and Guidelines Calculation

On May 28, 2018, Puke and co-defendant Karliss Vitols were arrested in Florida based on charges brought in Michigan related to one of Vitols's victims in the instant case. (PSR ¶ 49.) Michigan authorities dismissed the case in September 2018 in favor of the federal offense, and Puke was writted to the Southern District of New York, arriving on October 31, 2018. (*Id.* ¶¶ 23, 49.)

On January 10, 2019, pursuant to a plea agreement, Puke pleaded guilty to conspiracy to commit wire fraud, as charged in the Indictment. (*Id.* ¶ 5.) The plea agreement provides for a Guidelines Range of 21 to 27 months' imprisonment based on an offense level of 16 and a criminal

history category of I.  (*Id.* ¶ 6)  The plea agreement's Guidelines calculation is in accord with the PSR.  (*See id.* ¶¶ 30-41.)

### C. Discussion

#### 1. Applicable Law

As the court is aware, the Guidelines still provide important guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005).  Indeed, although *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.  *Booker*, 543 U.S. at 264.  As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark."  *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7).  *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

>       (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>       (B)   to afford adequate deterrence to criminal conduct;
>       (C)   to protect the public from further crimes of the defendant; and
>       (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18  U.S.C. § 3553(a)(2).

#### 2. A Guidelines Sentence Is Reasonable in This Case

The Government respectfully submits that a sentence within the Guidelines Range of 21 to 27 months is sufficient, but not greater than necessary, to comply with the purposes of sentencing.  Weighing the applicable factors under 18 U.S.C. § 3553(a)(2), it is clear that the seriousness of the offense, and the need to promote respect for the law, provide just punishment, afford adequate deterrence and protect the public, are all significant considerations in crafting a just sentence given the conduct at issue in this case.  A sentence within the Guidelines Range acknowledges the most pernicious effects of the defendant's conduct and its impact on individual victims, promotes due respect for the laws designed to protect the financial security of both persons and institutions in

the United States, will serve to dissuade similarly situated conspirators and make more difficult the task of those implementing the scheme overall, protects the public at large, and most importantly will justly punish the defendant's behavior within this far-reaching and damaging conspiracy.

*First*, a significant prison sentence is necessary to reflect the seriousness of the defendant's conduct, to promote respect for the law, and to provide just punishment. The conspiracy outlined herein resulted in millions of dollars in losses to consumers. The victims of the conspiracy are, by and large, everyday Americans. As reflected in victim impact statements, many victims devoted considerable savings and emotional investment to their intended purchases – frequently classic cars. Typically, these were not hyper-luxury items available only to those with a maximum quotient of disposable income, but collector vehicles pursued by those who sought to access the dreams and freedoms of their youth, or recall a bygone era. They sought cars or boats that connoted a sense of history, status, and sentiment: a 1949 Chevy Truck, a Ford Bronco, an Airstream trailer. Many of the victims have reported living on fixed or otherwise low incomes, saving funds, and waiting for the right opportunity, and nearly all describe their surprise at being taken in by a complex scam. The conspirators went to impressive lengths; far from a random, mass email conceit, the conspirators posted advertisements using real business identities, took pains to provide photographs, VIN numbers, registration information, insurance history, and detailed records about the cars in an effort to prove their authenticity and *bona fides* as dealers.

The defendant's role in the case was therefore critical. By lending his name to shell corporations and opening corporate banking accounts, the defendant played a crucial part in convincing even careful victims to part with hundreds of thousands of dollars. Believing they were sending their money to a business – cloaked with a presumption of legitimacy – the victims did not suspect their money – and the seemingly legitimate individuals with which they were communicating – would disappear. The conspiracy therefore requires something more of participants like the defendant than that of a prototypical mule or courier. The defendant was required to take on a corporate identity, propagate that elemental falsehood across multiple financial institutions, and then act as the face of the conspiracy by entering the banks and withdrawing large sums through direct interactions with bank employees, explaining the funds had come from people, individuals whose names and intended purchases he needed to know should the bank employee ask.

The Government does not contend that the defendant was personally posting the ads or acting as the principal contact with the victims, but his role implicated fundamental and repeated misrepresentations to the banks and direct contact with the victims' funds, some of which he kept, and some of which he passed along to conspirators outside of the United States. Thus, the defendant was required by his role to be aware of new victims, their identities and intended purchases, and the times that they had opened themselves up to the fraud; it was the defendant's job to make sure the banks distributed that money as quickly as possible. Simply put, the fraud cannot be completed without front-line participants like the defendant.

*Second*, a sentence within the stipulated Guidelines range is significant, and is necessary to afford adequate deterrence to both the defendant as well as others similarly situated. While specific deterrence is relevant to the defendant's case, the Government submits that general

deterrent is the more resonant concern here.  As is evidenced by the size of this case, the amount of loss to victims, and the number of victims, the crimes committed by the victim are both incredibly serious and all too common.  Indeed, the defendant here came to the United States to perpetrate this fraud, where he lived in a house with three other individuals engaged in the same fraudulent activity.  A sentence within the Guidelines Range will help send a message to other individuals that taking part in such activity is not a risk-free enterprise.

### D. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence on the defendant within the Guidelines Range of 21 to 27 months' imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: _____
Emily A. Johnson
Matthew J.C. Hellman
Daniel G. Nessim
Assistant United States Attorneys
(212) 637-2409/2278/2486